Filed 4/30/21  Singh v. Molnar CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JASBIR SINGH,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CHRISTIAN S. MOLNAR,<br><br>    Defendant and Respondent. | B297036<br><br>(Los Angeles County<br> Super. Ct. No. BC519223) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge.  Affirmed.
        Betty Agawa and Ronald W. Betty for Plaintiff and Appellant.
        Murphy Pearson Bradley & Feeney, Michael P. Bradley and Jeff C. Hsu for Defendant and Respondent.

_____

Jasbir Singh, a restaurant owner and commercial landlord, appeals from a judgment after a bench trial entered in favor of his former attorney Christian S. Molnar. Molnar represented Singh in a series of disputes with one of Singh's tenants. As part of a mediated settlement of those disputes, the tenant agreed to deliver to Singh, via Molnar, a 10-year-old luxury sedan. Singh filed this action for conversion and related claims after Molnar took possession of the vehicle from the tenant, registered the vehicle in his own name, and then credited Singh $12,827—the estimated market value of the vehicle—against Molnar's unpaid attorneys' fees invoices.

On appeal, Singh contends the trial court erred in finding Singh and Molnar had agreed Singh would give the vehicle to Molnar as payment toward Molnar's fees and that payment with a vehicle did not violate Molnar's professional responsibilities to Singh. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *The Pardal Settlement*[1]

Singh, his wife Jaswinder Kaur, and their business entities owned and operated restaurants in Los Angeles and leased space to other restaurateurs.[2] Beginning in 2007 and continuing until

---

[1] The background facts are taken from the testimony and exhibits admitted at trial and the trial court's statement of decision. We note where the facts are in dispute.

[2] Singh, Kaur, and the Singhs' business entities Bola Properties, LLC, India's Grill, Inc., Jasmine Enterprises, Inc., and 3B Hotel, LLC were plaintiffs in the underlying action. In

March 2013, Molnar represented Singh in a variety of legal matters, including disputes with Singh's tenant, Sumant Pardal, concerning Pardal's lease and operation of a restaurant in Singh's building. The disputes resulted in litigation in the Los Angeles Superior Court. (*Pardal v. Singh* (Super. Ct. L.A. County, 2009, No. BC411140).) In 2012 Pardal filed a petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code (11 U.S.C. § 701 et seq.), and Singh filed an adversary action against Pardal in the bankruptcy case. (*In re Pardal* (Bankr. C.D. Cal. 2012, No. 2:12-bk-17634-RK).) Molnar's representation of Singh in connection with the two *Pardal* lawsuits was governed by an "Agreement for Legal Services" executed on October 18, 2012 (the legal services agreement).

The *Pardal* lawsuits were settled at a one-day mediation on February 27, 2013. Molnar represented Singh at the mediation, and Pardal was represented by attorney Kenderton Lynch. The settlement was memorialized in a settlement agreement executed by Singh and Kaur and Pardal and his wife, and it was approved as to form by Molnar and Lynch (the Pardal settlement).

Paragraph 2.2 of the Pardal settlement required Pardal and his wife to make four installment payments totaling $100,000, as follows: "(a) $12,500.00 on or before March 4, 2013, made payable to Christian S. Molnar IOLTA account;[3]

---

2018 the trial court granted summary judgment against India's Grill, Inc. and 3B Hotels, LLC. Only Singh appeals the judgment after trial. For simplicity we refer to Singh and the related parties collectively as Singh.

3 Business & Professions Code section 6211, subdivision (a), provides for lawyers and law firms to maintain pooled client trust

[¶] (b) $21,250.00 on or before March 1, 2014, made payable to Jaswinder Kaur; [¶] (c) $21,250.00 on or before March 1, 2015, made payable to Jaswinder Kaur; [and] [¶] (d) $45,000.00 on or before March 1, 2016, made payable to Jaswinder Kaur." The Pardal settlement also required Pardal and his wife "to deliver to [Singh] their 2003 Mercedes Benz automobile, . . . along with the title certificate properly endorsed transferring title to said automobile and the initial payment specified in 2.2(a) . . . ." Under the agreement, delivery was to take place at Lynch's law office on March 4, 2013, no later than 3:00 p.m. The agreement further stated, "Both the automobile and its title as well as the initial payment specified in 2.2 (a) above, shall remain in the custody and control of counsel for [Singh] until the expiration of fifteen (15) days from the date of the Chapter 7 Trustee . . . executes a Notice of Abandonment of [Pardal's] state court claims . . . and the executed Notice of Abandonment is served and provided that there are no objections thereto."

On March 1, 2013 Lynch sent an email to Molnar requesting modification of the Pardal settlement to extend Pardal's deadline to make the first payment by two weeks, from March 4 to March 18. Lynch added, "With regard to the 2003 Mercedes Benz, it is also my understanding that there will be no disruption with regard to the delivery of the Mercedes. However, it is also my understanding that the Mercedes has a blue tooth unit installed and a subsequent agreement has been reached that Mr. Pardal will leave the blue tooth unit in the Mercedes, but when you receive the Mercedes on Monday [March 4], you will

---

funds in an "IOLTA" account (Interest on Lawyer Trust Account), the interest on which is used to fund indigent services. (*Carroll v. State Bar* (1985) 166 Cal.App.3d 1193, 1198-1199.)

4

tender a check payable to Mr. Pardal or cash in the amount of $250.00." Molnar agreed to a two-week extension of Pardal's first installment payment provided the vehicle was delivered on March 4. Molnar also wrote, "My understanding from speaking with Jessie [Singh] is that the agreed price for the blue tooth is $200.00 not $250.00."

B.  *Transfer of the Vehicle to Molnar*

On the afternoon of March 4, 2013 Molnar traveled to Lynch's offices in Century City to take delivery of the vehicle. Pardal and Lynch were both present; Singh was not. Pardal and Molnar executed a bill of sale, prepared by Lynch, which stated in relevant part, "On March 4, 2013 Sumant Pardal transferred his 2003 Mercedes . . . to Jasbir Singh or Christian Molnar at a value of $15,000." Pardal also completed a Certificate of Title and a Notice of Transfer and Release of Liability, which identified Molnar as the transferee of the vehicle. Molnar wrote Pardal a check for $200 to pay for the wireless equipment that had been recently installed in the vehicle. Molnar then drove Pardal in the 2003 Mercedes to Pardal's home in Santa Monica while Pardal instructed Molnar on the features of the vehicle.

On March 5, 2013 Lynch emailed Molnar that the Pardal bankruptcy trustee did not object to the exemption of the vehicle from the estate and had filed a no-asset report, so Lynch was "99.99 percent positive the trustee will not be making a claim for the car, and you can submit paperwork to the DMV for the transfer, but to whom the car is being transferred, you or [Singh]. I think you want to cut [Singh] out, but on the release of liability with the DMV we have to report a transfer value." On March 7 Molnar submitted the transfer of title along with a payment of

5

$984 for tax, title, and registration fees to the Department of Motor Vehicles.

On March 18, 2013 Singh terminated Molnar as counsel after accusing Molnar of forging Singh's signature on the modification of the Pardal settlement that extended the payment schedule.[4]  Singh instructed Molnar in an email to deliver the vehicle "to me immediately which you are holding as part of the [P]ardal settlement."  On April 3, 2013 Singh sent a second email to Molnar asking for the return "of my Mercedes Benz S430 which was part of my settlement with Pardal's case."  Molnar responded, "[Y]ou gave me the car as a partial payment for your outstanding legal fees and invoices in the Pardal matter, in fact, it was your idea; the car was only included in the Pardal settlement after you proposed that I take it and I agreed to accept it.  Previously, according to you, . . . Mr. Pardal offered you the

---

[4]     On March 4, 2013 Lynch transmitted to Molnar a proposed modification of the Pardal settlement extending the deadline for the first settlement payment to March 18, 2013 and specifying the payment "will be delivered to the Law Offices of Christian S. Molnar."  Molnar testified he immediately forwarded this modification to Singh, who had earlier instructed him in writing to agree to the extension sought by Pardal.  Molnar did not receive a response from Singh by the time of Molnar's March 4 meeting with Lynch and Pardal, so Molnar signed the modification as "Jasbir Singh by Christian S. Molnar their attorney and authorized agent."  Singh separately signed the proposed modification with an interlineation that the first payment must be delivered to Kaur rather than to Molnar.  That version was not countersigned by Pardal.  Neither version modified the provision in the Pardal settlement requiring the first payment be made payable to Molnar's client trust fund account.

car in settlement, but, you rejected it because you had no use for it. . . . What you are receiving is a credit for the [Kelley] Blue Book private seller-value which is reflected in your March 31, 2013 invoice." (Italics removed.) Singh responded, "I never agreed to give you a car as a partial payment or a payment in trade or any of the [Kelley] [B]lue [B]ook value. I was disputing your . . . bills. [Pardal] traded that car as $40-50,000 in settlement to me not to you. I am the one who determine[s] the price of the car not anyone else . . . I wanted to have poss[ess]ion of the car and money from day one but you tr[i]cked me into your entire scam that you have to hold the car and money for 15 days in your poss[ess]ion."

On Molnar's March 31, 2013 attorneys' fees invoice to Singh, Molnar credited $12,827 toward Singh's outstanding balance, reducing the balance to $49,640. Molnar indicated on the invoice and later testified $12,827 was the price for a private party sale of a 2003 Mercedes Benz S430 listed in "[g]ood [c]ondition" as reported in the Kelley Blue Book automotive pricing guide.

C.      *The Complaint and Phase One Trial*

Singh filed this action on August 22, 2013 against Molnar and Stephanie Ching-Yee Chan, an associate attorney at Molnar's law firm. Singh's operative first amended complaint alleged 12 causes of action: (1) accounting; (2) breach of oral contract; (3) breach of written contract; (4) breach of fiduciary duty; (5) constructive trust; (6) conversion; (7) declaratory relief; (8) fraud & deceit; (9) equitable indemnification; (10) negligent misrepresentation; (11) legal malpractice; and (12) civil extortion. On August 29, 2014 Molnar filed a cross-complaint asserting

7

more than 20 causes of action, seeking payment for legal services, to enforce a charging lien based on the attorney services agreement, and for damages.[5]  On December 12, 2014 the trial court sustained Molnar and Chan's demurrer to the causes of action for constructive trust and equitable indemnification.

On January 31, 2017 the trial court[6] granted Singh and Chan's motion for summary judgment, or in the alternative, for summary adjudication in part.  The court granted summary judgment in favor of Chan and summary adjudication of Singh's claims against Molnar, except for conversion and declaratory relief, as well as breach of oral contract, breach of fiduciary duty, and legal malpractice to the extent those claims were premised on Molnar's alleged conversion.

On June 30, 2017 the parties entered into a stipulation to try all remaining causes of action asserted by both parties as a bench trial and to bifurcate the trial into two phases.  The first phase of trial would address only whether the legal services agreement governing the Pardal matters was valid; the second phase would address all other claims by Singh and Molnar, with Molnar presenting his case first.  In a statement of decision filed

---

[5]  Molnar filed a separate action against Singh asserting numerous claims for payment for legal fees and costs in other smaller matters.  (*Molnar v. Singh* (Super. Ct. L.A. County, 2014, No. SC122329).)  That action was consolidated with the present action for trial.

[6]  The case was reassigned to Judge Teresa A. Beaudet on September 15, 2015.  Judge Beaudet ruled on the summary judgment motion and presided over the trial.

8

on March 7, 2018 the trial court ruled that the legal services agreement was valid and enforceable.[7]

## D.    *The Disputed Evidence at the Phase Two Trial*

The 11-day phase two bench trial was held from June 27 to July 27, 2018.  Singh, Kaur, Pardal, Lynch, Molnar, and Molnar's wife Neelamba Molnar (Neelamba) testified about the Pardal settlement and the vehicle.  In addition, attorney Robert Kehr testified as an expert for Singh on legal malpractice and fiduciary duty issues, and attorney Randall Miller testified as Molnar's expert on the same issues.  The primary disputed issue at trial as to Singh's claims was whether Singh and Molnar agreed Molnar would keep the 2003 Mercedes as payment for legal services and credit Singh for the vehicle's market value.

### 1.    *Molnar's testimony*

Molnar testified it was Singh who suggested Molnar take the vehicle in connection with the Pardal settlement at the time of the February 27, 2013 mediation:  "We had a break during the mediation . . . , and we were in [the mediator's] building in Riverside, and we went down in the elevator, and we were just taking a walk.  And it was kind of odd because Mr. Singh wanted to walk [into] the garage, and we walked into the garage, and we walked up next to a car, and he said, 'Hey, that's a pretty nice car, isn't it?'  And I said—I didn't know what the purpose was, I was, like, 'Yeah.  It looks pretty nice.'  And then he said, 'Do you want the car?' and I said, 'I'm not sure why you're offering it to

---

7    Singh does not appeal the trial court's ruling on Molnar's summary judgment motion or the trial court's statement of decision following phase one of the trial.

9

me.' And he then told me that Mr. Pardal had come by his restaurant the week before the mediation and tried to talk settlement to him . . . . Mr. Pardal had offered him the car. And Mr. Singh indicated to me that he told him he didn't want the car, he had a brand-new S600 Mercedes."

Molnar testified that when he separated from Singh during the break, he called Neelamba and told her, "'[Singh] just offered me Sumant Pardal's car, and, you know, what do you think?'" Molnar and Neelamba discussed that Singh owed Molnar a lot of money. During a subsequent break or the lunch break, Molnar responded to Singh: "'Well, I think I will accept your offer of giving me the car, . . . I will give you a credit towards the monies you owe me for the value or reasonable value of the car, [which] to me is the [Kelley] Blue Book value of the car.'" Molnar believed he and Singh were in agreement the vehicle was probably worth $10,000 because it was an older model, "wasn't in terrific condition," and had been driven by a smoker, but Molnar told Singh he would confirm the Kelley Blue Book value and credit that amount to Singh. Singh responded, "That's fine." After the mediation, Singh also raised with Molnar that Pardal had paid $500 for wireless equipment to speak handsfree on the phone, and Singh inquired whether Molnar wanted it. Molnar asked Singh what Pardal wanted for the equipment, and Singh responded Pardal wanted $250 or $300, but Singh could talk Pardal down in price. Singh was able to negotiate a $200 price. After Molnar took possession of the vehicle, Singh called him to ask how he liked it, and Molnar responded, "It's pretty nice."

10

## 2. *Singh's testimony*

Singh testified he did not talk to Molnar during a break at the Pardal mediation, there was no lunch break at the mediation, and he did not offer Molnar the vehicle in exchange for a credit towards Molnar's legal invoices. They never discussed Molnar crediting him for the Kelley Blue Book value of the car, and the two never agreed Molnar would receive the car permanently.

Singh's understanding of the Pardal settlement was that Molnar would only take possession of the vehicle for the first 15 days, until the vehicle was abandoned in the Pardal bankruptcy proceeding. Singh had asked Molnar, "'Chris, when you pick up the car from Pardal, can you garage it [in] my home?'" Molnar responded, "'Due to the bankruptcy proceeding, it has to be held by a third party, in [a] third party's possession.'" With respect to the wireless equipment, Singh told Molnar, "'Hey, you're going to go pick up the car, write a check to Mr. Pardal for [the $200] I negotiated.'"[8] Singh first learned Molnar had assigned a value of $12,827 to the vehicle when he received Molnar's March invoice in April 2013, after he had terminated Molnar. Singh believed the vehicle was worth $50,000 at the time of the Pardal settlement.

On cross-examination, Singh admitted he made arrangements with other attorneys to pay significant portions of their attorneys' fees with meals at his restaurant in lieu of monetary payments.

---

[8]     On cross-examination, Singh stated he told Molnar he would reimburse Molnar $200 for the wireless equipment, but he never did.

11

### 3. *Neelamba's testimony*

Neelamba, who is an attorney at Molnar's firm, testified she received a call from Molnar on the day of the mediation and learned that Singh wanted to offer Molnar a vehicle as payment toward outstanding bills. Neelamba was very skeptical of the arrangement, but she reluctantly agreed Molnar could accept the vehicle in lieu of fees. Molnar texted Neelamba a picture of the vehicle, and she was not impressed. When Molnar brought the vehicle home she learned there was a tear in the front seat and the vehicle smelled. She explained, "It wasn't an exciting car. . . . It was just a car that came home and a little chunk of money taken off the bills."

### 4. *Expert witness testimony*

Kehr provided expert testimony on behalf of Singh as to whether Molnar's conduct in taking possession of the vehicle comported with a lawyer's ethical and fiduciary duties. Kehr was asked to assume as a hypothetical that pursuant to the Pardal settlement, Pardal's vehicle was to be transferred to Singh after being held by Molnar for 15 days, and Molnar instead transferred the vehicle to himself and unilaterally applied payment against Singh's outstanding invoices without consulting Singh as to the amount of that credit. Kehr opined Molnar's conduct would not meet the requirements of rule 3-300 of the State Bar Rules of Professional Conduct (rule 3-300), which restricts the circumstances in which an attorney may enter into a business transaction with a client or knowingly acquire a possessory

interest adverse to a client.[9]  Such a transaction must be fully in writing; the client must be given written notice of the right to obtain legal counsel regarding the transaction; and the terms of the transaction must be fair and reasonable to the client. Molnar's failure to ensure the transaction complied with rule 3-300 would constitute a breach of his duty of loyalty to Singh.  In response to a revised hypothetical, Kehr testified that even if Singh had instructed Molnar to take possession of the vehicle as payment for fees, the transaction still would not comport with the requirements of rule 3-300 and Molnar's fiduciary duties.  On cross-examination, Kehr admitted his opinion assumed the vehicle belonged to Singh under the Pardal settlement and there were no conditions precedent to Singh taking ownership of the vehicle.  Further, the rule 3-300 analysis did not apply if Singh did not have a right to possess the vehicle. On redirect examination, Kehr opined Molnar would still be in breach of rule 3-300 even if Molnar had a claim to fees written into a fee agreement because Molnar was not entitled to determine the value of a particular asset unilaterally or to take possession of an asset unilaterally.

Miller opined on behalf of Molnar that an oral agreement between Singh and Molnar to transfer Pardal's vehicle to Molnar as payment of Molnar's legal fees would not constitute a business transaction with a client subject to rule 3-300.  Miller explained

_____

[9]     The State Bar Rules of Professional Conduct in effect at the time of the events of this case were superseded by the current rules effective November 1, 2018.  Current rule 1.8.1 is substantially similar to former rule 3-300.  All further undesignated references to rules are to the State Bar Rules of Professional Conduct operative from September 14, 1992 to November 1, 2018.

13

that rule 3-300 "carves out or accepts as part of its language any transaction between an attorney and a client where the attorney is retained," and therefore a lawyer and client are free to change the manner of the lawyer's compensation under a fee agreement at any time without regard to rule 3-300.

Miller explained, "The fact that an attorney and client here discuss later on exactly how those services are going to be paid for would be something that's well within the purview of the original agreement.  If that's the case, then [rule] 3-300, at least the discussion or comment aspect of 3-300, makes it very, very clear that that's not subject to the regulation of 3-300."  Miller testified further that even if rule 3-300 applied, a transaction which Molnar credited Singh for the fair market value of the car was fair and reasonable.  Asked on cross-examination whether an attorney must discuss the price of the vehicle before crediting that amount to a fees invoice, Miller admitted it would be "prudent" to do so, but he opined that as long as the attorney "uses some objectively verifiable industry standard in determining the value of the asset—here, a car—[he] would find no problem with that."

E.  *Statement of Decision*

The parties filed closing briefs following the phase two trial, and on November 5, 2018 the trial court issued a proposed statement of decision.  After considering the parties' written objections, on January 22, 2019 the court issued an 11-page

14

statement of decision addressing Singh's conversion-related claims.[10]

The trial court found Molnar did not convert the vehicle when he took possession and transferred it to his own name. The court reasoned, "The only truly disputed material fact during the trial regarding the [v]ehicle was whether [Singh] had agreed at the [m]ediation, to give Molnar the [v]ehicle as a payment towards the attorney fees that [Singh] owed Molnar. Molnar testified that this was the case, and Singh testified that it was not." The court found "the testimony of Molnar was credible and consistent with the terms of the Pardal [s]ettlement and the conduct of Pardal and Pardal's counsel." Further, Singh offered no explanation why the Pardal settlement expressly stated the vehicle and its title, along with the initial settlement payment, would remain in the custody and control of Molnar until the expiration of the 15-day bankruptcy abandonment period if the parties did not contemplate the vehicle would go to Molnar. The court explained, "The 15-day waiting period . . . could have passed while the [v]ehicle was in the possession of [Singh] rather than in Molnar's possession if the [v]ehicle was going to be kept by [Singh]." Moreover, neither Pardal nor Lynch expressed surprise the vehicle was transferred to Molnar, in that Lynch emailed Molnar about Molnar writing a check for the wireless equipment, and Pardal showed Molnar the features of the vehicle when the two drove to Pardal's home on March 4, 2013. The court found Neelamba's testimony regarding her conversation with Molnar about Singh's offer on the day of the Pardal

---

[10] On March 22, 2019 the trial court issued a separate statement of decision addressing Molnar's claims for attorneys' fees.

15

mediation "seemed to be forthright," and although Neelamba had a bias as Molnar's wife, as an attorney she was an officer of the court. The court found it relevant Singh had on other occasions paid legal fees with something other than money. The court concluded that because Singh and Molnar had an oral agreement to transfer the vehicle from Pardal to Molnar, Molnar did not convert the vehicle. Therefore, Singh did not prevail on his causes of action for conversion and breach of oral contract.

The trial court held further Singh did not prevail on his causes of action for breach of fiduciary duty and legal malpractice based on Molnar's alleged violation of rule 3-300. The court observed Kehr based his opinion on the assumption Singh had a right to possess the vehicle, and Kehr did not opine as to whether rule 3-300 applied to nonmonetary payments for legal fees. By contrast, Miller opined rule 3-300 "does not govern a client's nonmonetary payment for attorneys fees." The court found that Miller's testimony "more properly applied to the facts of this case."[11]

---

[11] The court found Singh was not entitled to declaratory relief because the first amended complaint did not "identify any controversy regarding the [v]ehicle nor does it contain any request to have the Court make any declaration regarding the [v]ehicle." Singh does not on appeal address the trial court's judgment with respect to his declaratory judgment cause of action.

16

On May 7, 2019 the trial court entered judgment in favor of Molnar.[12] We consider Singh's premature notice of appeal filed on April 15, 2019 a valid "notice of appeal filed after judgment is rendered but before it is entered" and treat the notice as filed immediately after entry of judgment. (Cal. Rules of Court, rule 8.104(d)(1); see *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 607.)

## DISCUSSION

A.    *Standard of Review*

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981; accord, *Aljabban v. Fontana Indoor Swap Meet, Inc.* (2020) 54 Cal.App.5th 482, 496.) We generally review the trial court's findings of fact for substantial evidence. (*Aljabban*, at p. 496; *Thompson*, at p. 981.) However, "'this test is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence. In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals,

---

[12]    In its March 22, 2019 statement of decision regarding Molnar's claims for attorneys' fees, the trial court reduced Molnar's recovery by $2,173, finding Molnar should have credited Singh $15,000, the amount on the bill of sale prepared by Lynch for the vehicle, and not the $12,827 Kelley Blue Book value. The court held, "There was no testimony that Singh had agreed to the Kell[e]y Blue Book valuation used by Molnar, and there was no explanation as to why the [b]ill of [s]ale signed by Molnar did not reflect the proper amount for the value of the [v]ehicle."

17

it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.'" (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465 (*Sonic*); accord, *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) "'Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Sonic,* at p. 466; accord, *Dreyer's Grand Ice Cream*, at p. 838.)

Singh contends we should review the trial court's decision on his conversion claim de novo because the appeal raises the application of law to undisputed facts. It does not. Whether Singh and Molnar orally agreed Molnar would receive the vehicle from the Pardal settlement as payment for attorneys' fees was a disputed fact at trial, and the court's finding there was an agreement was dispositive of Singh's conversion-related claims. However, we independently review whether an oral agreement for Singh to transfer the vehicle to Molnar violated Molnar's fiduciary duties to Singh. (See *Feresi v. The Livery, LLC* (2014) 232 Cal.App.4th 419, 425 [questions concerning the scope of fiduciary duties are a legal issue subject to de novo review].)

18

B.  *Singh Failed To Present Evidence Compelling a Finding Molnar Converted the Vehicle*

To prove the tort of conversion, a plaintiff must prove three elements: "'(a) [P]laintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights, and (c) resulting damages.'" (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150; accord, *Hodges v. County of Placer* (2019) 41 Cal.App.5th 537, 551.)  Singh contends the trial court erred because the Pardal settlement did not specify that the 2003 Mercedes was to be transferred to Molnar permanently, instead providing only that Molnar would retain custody and control over the vehicle for 15 days from abandonment of the claim for the vehicle in the bankruptcy proceeding.  Thus, Singh had ownership and the right to possess the vehicle.  Singh argues further that even if there was some general agreement for Molnar to take the vehicle, there was no meeting of the minds because Molnar unilaterally assigned a value to the vehicle.

Singh ignores the evidence presented  by Molnar showing that Singh and Molnar agreed the vehicle would be transferred from Pardal to Molnar.  Molnar testified Singh showed him the vehicle during a break at the February 27, 2013 mediation and proposed Molnar should take it because Singh had no use for it.  Molnar explained he and Singh discussed that Singh would be credited the Kelley Blue Book price, and Singh responded, "That's fine."[13]  Singh's conduct after their agreement—including helping

---

[13]    As discussed, the trial court found there was no testimony that Singh had agreed to the valuation used by Molnar, but this finding is not inconsistent with Molnar's testimony that he and

to broker Molnar's purchase of the wireless equipment from Pardal and asking how Molnar enjoyed the car—showed that Singh understood the car belonged to Molnar. Neelamba also testified Molnar contacted her during the mediation to obtain her approval to accept Singh's offer of the car in lieu of monetary payment for outstanding attorneys' fees. As the trial court observed, Pardal and Lynch likewise behaved consistently with an understanding the Pardal settlement transferred the vehicle to Molnar, expressing no surprise that the vehicle was being transferred to him, arranging for payment for the wireless equipment, and explaining to Molnar how the vehicle worked.

Singh testified he and Molnar never discussed the vehicle on the day of the Pardal mediation, and at no time did Singh offer the car to Molnar, let alone agree Molnar would keep the car and give Singh a credit for the value of the car. But Singh's testimony was directly contradicted by Molnar's testimony, and the trial court found Molnar's (and Neelamba's) testimony "credible and consistent with the terms of the Pardal [s]ettlement and the conduct of Pardal and Pardal's counsel." The Court also found Singh was unable to explain why the Pardal settlement was structured to give initial possession of the car to Molnar during the 15-day waiting period instead of Singh. Singh testified Molnar told him the vehicle had to be held by a third party because of the bankruptcy proceeding, but Singh did not

---

Singh agreed Molnar would credit Singh for the Kelley Blue Book value. Rather, the trial court found there was no support for the specific $12,827 credit applied by Molnar, especially in light of the $15,000 bill of sale Molnar signed.

provide any legal support for this proposition.[14]  Further,
although Singh testified he intended to reimburse Molnar for the
$200 Molnar paid Pardal for the wireless equipment, Singh's
failure to reimburse Molnar is consistent with Molnar's
testimony Singh knew the car belonged to Molnar.

Singh has therefore failed to present "'uncontradicted and
unimpeached'" evidence that is "'of such a character and weight
as to leave no room for a judicial determination'" that Singh
agreed to transfer the vehicle to Molnar in partial payment for
attorneys' fees.  (*Sonic, supra,* 196 Cal.App.4th at p. 466; *Dreyer's
Grand Ice Cream, Inc. v. County of Kern, supra*, 218 Cal.App.4th
at p. 838.)

Accordingly, because Singh did not present evidence
compelling a finding Molnar converted the vehicle, there are no
grounds to reverse the trial court's judgment as to the sixth cause
of action for conversion.  Likewise, there are no grounds to
reverse the judgment as to the second cause of action for breach
of oral contract, because that claim was limited at summary

---

[14]    The Pardal settlement is more ambiguous as to the transfer
of the vehicle than the trial court acknowledged because it states
the Pardals would "deliver *to Plaintiffs* their 2003 Mercedes Benz
automobile, . . . along with the title certificate properly endorsed
transferring title to said automobile . . . [at] the law offices of
[Lynch]."  (Italics added.)  "Plaintiffs" was defined as Singh,
Kaur, and their companies, not Molnar.  And the bill of sale
drafted by Lynch stated the vehicle had been transferred "to
Jasbir Singh or Christian Molnar."  But despite any ambiguity,
the Pardal settlement and conduct of Pardal and Lynch show the
parties at least contemplated Molnar might be the ultimate
transferee, which is inconsistent with Singh's testimony that he
and Molnar never discussed Molnar receiving the vehicle.

21

adjudication to the allegation Molnar breached an implied term in the agreement governing Singh's representation to refrain from self-dealing when he converted the vehicle.

C.   *The Parties' Agreement for Singh To Give Molnar the Vehicle as Payment for Legal Services Did Not Violate Rule 3-300*

Singh contends that if there was an oral agreement to transfer the vehicle to Molnar, Molnar breached his fiduciary duty to Singh by entering into a transaction to acquire property adverse to his client in violation of rule 3-300.[15] (See *BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1227 [although a violation of the rules of professional conduct "does not in itself provide a basis for civil liability[,] [citation] . . . the rules, 'together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which the attorney owes to his or her client'"].) Singh's contention lacks merit because rule 3-300 does not apply to Singh's agreement with Molnar.[16]

---

[15]   The rules were adopted by the Board of Governors of the California State Bar and approved by the Supreme Court. (Rule 1-100(A).)

[16]   Because we affirm the judgment in favor of Molnar on Singh's conversion claim, his claims for legal malpractice and breach of fiduciary duty would likewise appear to fail because the trial court granted summary adjudication in favor of Molnar "to the extent that these claims are premised on anything other than Molnar's alleged conversion of the vehicle." However, for reasons that are not evident, the parties' experts opined at trial on whether Molnar violated rule 3-300, and the trial court addressed

22

Rule 3-300 provides, "A member [of the State Bar] shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied: [¶] (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and [¶] (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and [¶] (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

The accompanying discussion note[17] clarifies, "Rule 3-300 is not intended to apply to the agreement by which the member [of the State Bar] is retained by the client, unless the agreement confers on the member an ownership, possessory, security, or other pecuniary interest adverse to the client. Such an

_____

this question in its statement of decision. We therefore consider whether the trial court erred in concluding rule 3-300 did not apply to support a claim for breach of fiduciary duty. Singh does not argue on appeal that Molnar's violation of rule 3-300 supports his legal malpractice claim.

[17] Rule 1-100(C) provided as to the "Discussion" notes following each rule, "Because it is a practical impossibility to convey in black letter form all of the nuances of these disciplinary rules, the comments contained in the Discussions of the rules, while they do not add independent basis for imposing discipline, are intended to provide guidance for interpreting the rules and practicing in compliance with them."

agreement is governed, in part, by rule 4-200.[18]  [¶] . . . [¶] Rule 3-300 is intended to apply where the member wishes to obtain an interest in [a] client's property in order to secure the amount of the member's past due or future fees."[19]  (Rule 3-300, Discussion; see *Fletcher v. Davis* (2004) 33 Cal.4th 61, 71-72 (*Fletcher*) [applying rule 3-300 to charging lien to secure hourly-rate attorneys' fees]; but see *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38, 49 [charging lien in contingency fee agreement not subject to rule 3-300].)

The Supreme Court in *Fletcher* held an attorney's oral agreement to secure payment of his hourly fees by taking a charging lien against the client's future recovery was an adverse interest within the meaning of rule 3-300.  (*Fletcher, supra*, 33 Cal.4th at p. 71.)  The court explained, "[A] charging lien

---

[18]    Rule 4-200 prohibits an attorney from entering into an agreement for, charging, or collecting an unconscionable fee. (Rule 4-200(A).)  The rule sets forth factors relevant to a determination of unconscionability, including the proportionality of the fee to the value of the services performed. (Rule 4-200(B)(1).)

[19]    Singh does not argue on appeal that the agreement for him to give Molnar the vehicle as payment for attorneys' fees constituted a business transaction under rule 3-300, and there is no evidence the exchange involved any economic expectancy other than a reduction in fees.  (See, e.g., *Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1177 [attorney's agreement to discount fees in exchange for client's agreement to settle litigation was not a business transaction subject to rule 3-300]; compare *BGJ Associates v. Wilson, supra*, 113 Cal.App.4th at p. 1227 [agreement with client to jointly acquire property adjacent to parcel for which attorney was retained in litigation was a business transaction subject to rule 3-300].)

grants the attorney considerable authority to detain all or part of the client's recovery whenever a dispute arises over the lien's existence or its scope. That would unquestionably be detrimental to the client." (*Id.* at p. 69) Thus, "an adverse interest exists where the fee arrangement 'gives the attorney an ownership interest in client property that has a value *greater* than the amount absolutely agreed upon in fees.'" (*Ibid.*) The *Fletcher* court contrasted the charging lien to a client's payment of attorneys' fees with an unsecured promissory note, which does not fall within rule 3-300. (*Fletcher*, at p. 68.)

Here, Molnar has not obtained a charging lien or other security interest in property owned by Singh to secure the recovery of Molnar's fees. Instead, at the time Singh negotiated the Pardal settlement, he also agreed to pay a specific portion of the settlement proceeds to Molnar as payment for attorneys' fees. It is a common and acceptable practice for a settlement agreement to provide for a portion of the settlement payment to go to the attorney as compensation for attorneys' fees. The fact the payment was in the form of a vehicle included in the settlement, albeit unusual, does not transform the payment into a secured lien on future proceeds. And, unlike charging liens, Molnar has no ownership interest in Singh's property greater than the value of the attorneys' fees owed. Rather, Singh was credited for the value of the vehicle.

Singh cites to no authority for his contention rule 3-300 applies to an agreement to accept a nonmonetary payment for attorneys' fees, nor is there. Rather, the payment would be governed by rule 4-200, which prohibits an attorney from charging an unconscionable fee. Singh did not present evidence showing that either the $12,827 valuation of the vehicle applied

by Molnar on his invoices or the $15,000 valuation the trial court included as an offset to Molnar's fees constituted an unconscionable fee in violation of rule 4-200. Because rule 3-300 did not apply to the parties' oral agreement for the transfer of the vehicle, the trial court did not err in finding against Singh on his claim for breach of fiduciary duty.[20]

## DISPOSITION

The judgment is affirmed. Molnar is to recover his costs on appeal.

FEUER, J.

We concur:

PERLUSS, P. J.

McCORMICK, J.[*]

---

[20] Because we find rule 3-300 did not apply to the parties' oral agreement, we do not reach Molnar's arguments that the agreement complied with rule 3-300, nor do we reach the relevance of the experts' testimony at trial.

[*] Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.