[No. B143157. Second Dist., Div. Four. Dec. 3, 2003.]

BGJ ASSOCIATES, LLC et al., Plaintiffs and Respondents, v.
JEFF WILSON et al., Defendants and Appellants.

[No. B147634. Second Dist., Div. Four. Dec. 3, 2003.]

BGJ ASSOCIATES, LLC et al., Plaintiffs and Appellants, v.
M2B2, LLC et al., Defendants and Respondents.

## Counsel

Sidley Austin Brown & Wood, James M. Harris, Thomas P. Hanrahan and Jill Faulker McNeal for Plaintiff and Appellant and for Plaintiff and Respondent Jerome Janger.

Greenwald, Pauly, Foster & Miller, Andrew S. Pauly and Joshua D. Wayser for Plaintiffs and Appellants and for Plaintiffs and Respondents BGJ Associates and Robert Goldman.

Law Offices of Philip Kaufler and Philip Kaufler for Defendants and Appellants Jeff Wilson and Wilcox,

Hillel Chodos and Deborah Chodos for Defendant and Respondent M2B2.

Quinn Emanuel Urquhart Oliver & Hedges, Steven G. Madison, James J. Webster and Naomi J. Harlin for Defendants and Respondents Linda Brittan and Roxbury Managers, Ltd.

## OPINION

**EPSTEIN, Acting P. J.**—In these appeals, we consider the impact of an attorney's entry into a business transaction with a client, and the client's subsequent decision to withdraw from the transaction. The evidence in this case demonstrates that the attorney's conduct was in violation of the California Rules of Professional Conduct, rule 3-300, and also amounted to undue influence within the meaning of Probate Code section 16004. For that reason, the alleged agreement was voidable, and once the client acted to void it, the trial court properly refused to enforce the agreement or to grant any other requested relief arising from the voided agreement.

## FACTUAL AND PROCEDURAL SUMMARY

Maynard Brittan (Brittan) and his wife Linda Brittan are the owners of property near the intersection of Wilshire and Santa Monica Boulevards, where they operate Roxbury Managers, Ltd., a property management company. For many years, they used four parking places on a 150-foot strip of land directly behind this property. The land was part of a vacant railroad right of way owned by Union Pacific Railroad (railroad).[1] The railroad property consisted of two parcels. Parcel 1, on which the parking spaces were located, is west of the intersection of Santa Monica and Wilshire; parcel 2 is east of the intersection, adjacent to a Budget Rent-a-Car facility owned by M2B2, a limited liability company.

Brittan had unsuccessfully tried to purchase the portion of parcel 1 that included the four parking spaces. In October 1996, he retained Attorney Jerome Janger to file a lawsuit to declare that he had acquired a prescriptive easement on this property. In July 1997, during Brittan's deposition in the easement lawsuit, counsel for the railroad spoke with an associate in Janger's law office about the possibility of settling the case. The railroad offered to sell Brittan the land behind his building on the condition that parcels 1 and 2 be sold together and the easement lawsuit be dismissed. After the deposition, Brittan told Janger he wished to pursue the settlement.

The railroad previously had discussed sale of the right of way with other parties, including M2B2 and Jeff Wilson, who owns property next to parcel 1.

---

[1] As of 1995, the property was beneficially owned by the railroad (48 percent), the Beverly Hills Land Company (48 percent) and the Whittier Trust (1.8 percent).

Janger's friend and former client, Robert Goldman, also had attempted to buy the property from the railroad. Goldman had been unsuccessful because the railroad could not provide clear title, but he remained interested in the property.

Janger told Brittan about Goldman's interest in purchasing the property, and at Brittan's request, introduced Brittan to Goldman. Brittan and Goldman discussed the property, and invited Janger to join them in a possible purchase. According to Janger, the three formed an oral joint venture in July 1997, by which they each would acquire a one-third interest in the railroad property and each would contribute one-third of the capital. The potential purchase expressly required Brittan to dismiss the easement lawsuit. The joint venture was given the name BGJ, based on the first letter of each of the participants' names. Janger corresponded with the railroad, indicating that his client, Brittan, was interested in the purchase of parcels 1 and 2.

By November 1997, the railroad made it known that it was discussing the sale of the two parcels with other parties, including M2B2 and Jeff Wilson. Soon after, Wilson withdrew from the discussions. BGJ and M2B2 discussed the possibility of making a joint offer to the railroad for the purchase. They agreed to pursue the purchase under an arrangement by which BGJ would own parcel 1, and M2B2 would own parcel 2.

Janger continued to represent Brittan in the easement lawsuit. He advised Brittan to put that action on hold while pursuing the purchase of the railroad property through the joint venture. Janger obtained a continuance of that litigation.

In September 1998, Janger prepared, signed, and filed articles of organization for BGJ Associates, LLC. The articles called for the parties to enter into a written operating agreement for the management and operation of BGJ. On November 6, 1998, Janger faxed Brittan a draft operating agreement. Brittan told Janger he believed the terms of the draft agreement were unfair to him, particularly the capital call and default provisions, since they would allow Janger and Goldman to "gang up" on him by a simple majority vote. The draft agreement included an acknowledgment that Janger was not representing Goldman or Brittan, and that Janger had advised the others to have the agreement reviewed by independent counsel. This was the first such advice since the parties began discussing the purchase of the railroad property in July 1997.

At a dinner party on November 6 (a Friday), Brittan talked with Attorney Rubin Turner, who agreed to look over the draft operating agreement. Over the weekend, Turner reviewed the draft and other documents relating to the

purchase of the property. In Turner's view, the capital call and default provisions were unfair to Brittan. Turner agreed to attend a meeting with Janger and Goldman on the following Monday, November 9.

On November 9, Brittan tendered his initial capital contribution to Janger, but in an accompanying letter, stated his disagreement with the terms of the draft operating agreement. At Janger's request, Brittan and Janger met alone that morning to discuss the matter.

On the afternoon of November 9, Goldman, Janger, Brittan and Turner met to discuss the proposed transaction and the draft operating agreement. At that meeting, Goldman signed a purchase and sale agreement, purportedly on behalf of BGJ. (This agreement was between the railroad and Wells Fargo, as seller, and BGJ and M2B2 as buyer.) Brittan signed a tenancy in common agreement (between BGJ and M2B2) on behalf of BGJ, but he did not sign the draft operating agreement or any other agreement with Janger and Goldman.

There followed over the next several weeks a series of letters between Brittan's attorney, Turner, and Janger, attempting to resolve the parties' differences as to the operating agreement. On November 11, Janger suggested some alternatives for resolving the disputed terms. Then, on November 12, Janger informed Brittan's attorney by letter that he and Goldman did not believe they should have a partnership agreement with Brittan, based on the number of issues on which they did not see "eye to eye." Janger continued: "Although we should have perhaps discovered these differences at some earlier stage, the fact remains that they exist, and have come to light while we are still at the alter and before marriage vows have been spoken." Janger later sent a draft option agreement to Turner proposing that Janger and Goldman purchase parcel 1 together, and give Brittan an option to purchase the strip of land behind his business. Neither Goldman nor Brittan agreed to this proposal.

By December 8, 1998, Goldman had serious reservations about the purchase, based on negotiations he had with Brittan, Wilson, and the City of Beverly Hills. On that date, Janger called M2B2's principal, Alan Liker, and told him he and Goldman did not intend to go forward with the deal. He confirmed this statement in a letter, stating that "unless something changes between now and December 21, we do not intend to proceed with you in purchasing the subject property." In this letter, Janger indicated he had no objection to M2B2 discussing the possibility of proceeding with Wilson or Brittan if Janger and Goldman opted not to proceed. A confirming letter from Liker indicated that M2B2 would be contacting Wilson and Brittan to determine whether they were interested in going forward with the transaction.

On December 11, 1998, Brittan confirmed by letter that Janger and Goldman had "passed" on the deal, and that he was making arrangements to return their funds to them. Then, on December 15, 1998, Janger wrote to Alan Liker of M2B2 to confirm a conversation to the effect that "BGJ Associates, LLC (with Bob Goldman and myself as principals) intends to proceed with the purchase, meaning that on December 21, 1998, it is our present intention (subject to continuing due diligence) to approve the contingencies in Paragraph 5.2 of the Purchase and Sale Agreement."

M2B2 responded the following day with a letter recounting that in early December, Janger had unequivocally stated by telephone and in writing that he and Goldman did not intend to proceed with the transaction, and had sanctioned M2B2's negotiations with Brittan and Wilson for the same transaction. Then a week later, Janger had sent a letter stating he and Goldman intended to proceed with the transaction. M2B2 called these tactics "lawyerly equivocations" through which Janger and Goldman sought to "fabricate a pretext for claiming a share of the benefits of the transaction" if it was beneficial, but provide an equally fabricated pretext for backing out of it if that course appeared more advantageous. M2B2 stated its intent to proceed without Goldman and Janger unless they appeared at the closing with their share of the money and the dismissal of the Brittan lawsuit.

Additional correspondence failed to resolve the dispute. Janger finally substituted out as counsel for Brittan in the easement lawsuit on December 24, 1998. Ultimately, Brittan, M2B2 and Wilson completed the purchase together, under terms which were more favorable to Brittan. M2B2 executed a quitclaim deed giving Brittan free and clear title to the portion of parcel 1 he sought in his easement lawsuit.

BGJ Associates, LLC, Jerome Janger, and Robert Goldman brought this action against Maynard Brittan, Linda Brittan, Roxbury Managers, Ltd., M2B2, Jeff Wilson, and Wilco, LLC. They asserted causes of action for breach of oral contract based on an alleged oral agreement on November 9, 1998; breach of fiduciary duty; unjust enrichment; negligent and intentional interference with contractual relations; inducing breach of contract; and constructive trust. Defendants asserted as an affirmative defense that the contract was void or voidable because Janger entered into a business transaction with his client, Brittan, without full disclosure and advice and without an informed waiver and consent. Maynard Brittan filed a cross complaint against Janger, Goldman, and BGJ in which he sought a declaration that BGJ was not an existing entity and that it lacked legal capacity to enter into any agreements and sought to rescind any alleged transactions or agreements among Brittan, Goldman, Janger, and BGJ. He also alleged that Janger and Goldman conspired against him in breach of Janger's fiduciary duty to Brittan.

Wilson and his company, Wilco, were granted summary judgment on all claims against them. The court granted plaintiffs' motion for new trial on the claim for constructive trust against Wilson. In case No. B143157, Wilson and Wilco appeal from the order granting a new trial.[2]

The case went to trial as to the remaining defendants. Defendants requested a bench trial on the equitable claims. Plaintiffs objected. After lengthy colloquy and additional briefing about the scope of the equitable claims, the court conducted an eight-day bench trial at which the parties presented evidence regarding Janger's violation of rule of 3-300 of the California Rules of Professional Conduct (rule 3-300) and its statutory counterpart, Probate Code section 16004. The court found Janger's entry into a business transaction with a client violated both the rule and the statute, and that the resulting presumption of undue influence was not overcome since the transaction was not fair and reasonable. The court held that the alleged contract was void as against public policy and therefore "did not confer upon BGJ or any of its alleged partners any rights or powers, including the capacity to sue, recover damages or obtain any remedy on BGJ's behalf." Judgment was entered in favor of all remaining defendants except Maynard Brittan, whose cross-complaint for damages remains pending.[3] In case No. B147634, plaintiffs appeal from this judgment. The two appeals have been consolidated for purposes of oral argument and decision.

## DISCUSSION

### I

Rule 3-300 addresses an attorney's obligations when engaging in a business transaction with a client. It provides: "A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied: [¶] (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and [¶] (B) The client is advised in writing that the client may seek the advice of an independent

---

[2] This order, by Judge Lorna Parnell, preceded the bench trial and judgment by Judge Joanne B. O'Donnell.

[3] This case presents an exception to the one final judgment rule: "where, as here, there is a judgment resolving *all* issues between a plaintiff and one defendant, then either party may appeal from an adverse judgment, even though the action remains pending between the plaintiff and other defendants." (*Estate of Gonzalez* (1990) 219 Cal.App.3d 1598, 1601–1602 [269 Cal.Rptr. 68]; *Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 577–578 [113 Cal.Rptr.2d 255].)

lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and [¶] (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

The transaction at issue is an oral joint venture agreement allegedly formed on November 9, 1998, among Janger, Goldman, and Brittan. Strong evidence supports the trial court's conclusion that Janger failed to meet the professional obligations set out in rule 3-300 as to this alleged transaction. It is not disputed that Brittan was Janger's client as of that date. The subject of that representation, the easement lawsuit against the railroad, was inextricably intertwined with the subject of the alleged joint venture, the purchase of land from the railroad, since the purchase expressly required dismissal of Brittan's easement lawsuit.

■ In entering into this business transaction with his client, Janger was required to satisfy all three requirements of rule 3-300. First, the transaction and its terms had to be fair and reasonable to Brittan, and had to be "fully disclosed and transmitted in writing" to Brittan in a manner which should reasonably be understood. Putting aside for the moment whether the transaction and terms were fair and reasonable, Janger failed to satisfy this disclosure requirement. The agreement he seeks to enforce is an oral agreement; he expressly disavows any attempt to rely on the written proposed operating agreement for BGJ. Having failed to transmit the transaction and its terms to Brittan in writing, he did not comply with rule 3-300.  ·

■ Janger also was required to advise Brittan in writing that Brittan could seek the advice of an independent lawyer, and give Brittan a reasonable opportunity to do so. Arguably this requirement was met by the statement in the proposed operating agreement advising the parties of their right to independent counsel. Brittan received the proposed operating agreement, and hence this advisement, on November 6, and promptly sought advice from an attorney prior to the November 9, 1998 meeting at which the alleged oral agreement was formed.

The final requirement is that the client consent in writing to the terms of the transaction. Brittan gave no written consent to the terms of the transaction. Janger did not satisfy the requirements of rule 3-300.

■ Janger argues that the rule does not apply once a client obtains the advice of independent counsel. This argument is refuted by the language of the rule. Paragraph (B) of rule 3-300 requires that the client be advised of the right to independent counsel and be given a reasonable opportunity to seek that advice. Paragraph (C) of rule 3-300 then requires that "[t]he client *thereafter* consents in writing to the terms of the transaction . . . ." (Italics

added.) The consent must follow the opportunity to consult with independent counsel; it is not an alternative to such consultation. The rule clearly contemplates a situation in which a client does consult with counsel, then consents in writing to the terms of the agreement. Brittan's consultation with another attorney did not relieve Janger of his obligations under rule 3-300.

■ This conclusion does not determine the enforceability of the alleged oral contract. A violation of the Rules of Professional Conduct subjects an attorney to disciplinary proceedings, but does not in itself provide a basis for civil liability. (*Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 658 [109 Cal.Rptr. 269].) But the rules, "together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which the attorney owes to his or her client." (*David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 884, 890 [250 Cal.Rptr. 339].)

Probate Code section 16004 is a statutory complement to rule 3-300. It provides in subdivision (c): "A transaction between the trustee and a beneficiary which occurs during the existence of the trust or while the trustee's influence with the beneficiary remains and by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties. This presumption is a presumption affecting the burden of proof. This subdivision does not apply to the provisions of an agreement between a trustee and a beneficiary relating to the hiring or compensation of the trustee."

Probate Code section 16004 applies to the fiduciary relationship between attorney and client. (*Ramirez v. Sturdevant* (1994) 21 Cal.App.4th 904, 917 [26 Cal.Rptr.2d 554].) Accordingly, "[a] transaction between an attorney and client which occurs during the relationship and which is advantageous to the attorney is presumed to violate that fiduciary duty and to have been entered into without sufficient consideration and under undue influence." (*Lewin v. Anselmo* (1997) 56 Cal.App.4th 694, 701 [65 Cal.Rptr.2d 682].) As explained long ago in *Felton v. Le Breton* (1891) 92 Cal. 457, 469 [28 P. 490]: "While an attorney is not prohibited from having business transactions with his client, yet, inasmuch as the relation of attorney and client is one wherein the attorney is apt to have very great influence over the client, especially in transactions which are a part of or intimately connected with the very business in reference to which the relation exists, such transactions are always scrutinized by courts with jealous care, and are set aside at the mere instance of the client, unless the attorney can show by extrinsic evidence that his client acted with full knowledge of all the facts connected with such transaction, and fully understood their effect; and in any attempt by the attorney to enforce an agreement on the part of the client growing out of such

transaction, the burden of proof is always upon the attorney to show that the dealing was fair and just, and that the client was fully advised." (See also *Gold v. Greenwald* (1966) 247 Cal.App.2d 296, 305 [55 Cal.Rptr. 660].)

In this case, the court found that the presumption of undue influence was not rebutted.[4] The evidence strongly supports this finding.

Janger testified that he had a joint venture agreement with Brittan and Goldman in July 1997 by which the three of them would jointly acquire the railroad property. At that time, and up through the time of the alleged November 9, 1998 oral agreement, Janger was Brittan's attorney with regard to Brittan's lawsuit to obtain a portion of this same railroad property by prescriptive easement. Janger acknowledged that it was to his benefit, and to Goldman's benefit, that Brittan's easement lawsuit be put on hold while the object of the joint venture was pursued. Brittan was not advised about the benefits of the joint venture versus the benefits of his easement lawsuit, nor was he advised of the value of his easement lawsuit to the joint venture.

From July 1997, when (according to Janger) the joint venture was first created, to November 6, 1998, when Janger presented Brittan and Goldman with the proposed operating agreement for BGJ, the three men did not work out the precise terms of their joint venture. The first written presentation of concrete terms for the venture was in the proposed operating agreement for BGJ prepared by Janger and presented to Brittan and Goldman on November 6. Nothing in this draft provided that Brittan would obtain ownership of the land which was the subject of his easement lawsuit, or even an easement on that property. The court appropriately concluded that the absence of such provision was not fair and reasonable to Brittan. There were at least two other problems with the draft agreement: the capital call and default provisions would have enabled Janger and Goldman to override Brittan by a simple majority vote. For all these reasons, the trial court concluded the draft agreement was not fair and reasonable to Brittan. Brittan himself recognized the problem, because it was at this point, when presented with the draft agreement, that he sought independent counsel to review the agreement. The points of disagreement were never resolved, and the draft operating agreement was never signed.

---

[4] In their trial brief regarding the scope of the bench trial, plaintiffs asserted that if the court found a violation of rule 3-300, "the Court must then decide whether the November 9, 1998 transaction was nonetheless fair and reasonable to Mr. Brittan." In posttrial briefing, plaintiffs argued that the court should not make a determination under Probate Code section 16004: "Since that was not the requested scope of the hearing, and the introduction of evidence was therefore limited, this Court cannot properly make any finding under Section 16004 at this time." The court rejected this assertion, noting there was extensive evidence on the issues at trial, and that proof that the alleged agreement was fair and reasonable to Brittan was required under both rule 3-300 and Probate Code section 16004. The transcript confirms the court's view that the issue was fully presented for decision.

Of course, it is not the fairness of the unsigned draft operating agreement that is at issue, but the fairness of the alleged November 9 oral joint venture agreement. But the problems in the proposed agreement reveal that the parties were not in agreement on certain essential terms. More importantly, the alleged oral agreement required Brittan to dismiss his easement lawsuit, while the draft operating agreement contained no written commitment to provide Brittan with the object of that lawsuit, acquisition of the four parking spaces. And there was no evidence that Janger informed his client of the perils of entering into a joint venture where the other participants proposed a written agreement lacking in such material terms and protections, particularly where it required the client to give up something of value which would benefit the attorney and other joint venturer.

■   Where an attorney enters into a business arrangement with a client, " 'he must make it manifest that he gave to his client "all that reasonable advice against himself that he would have given him against a third person." [Citations.]' " (*Beery v. State Bar* (1987) 43 Cal.3d 802, 813 [239 Cal.Rptr. 121, 739 P.2d 1289].) Janger was unable to make this showing, and hence could not refute the presumption that the alleged oral agreement was the result of undue influence by which Janger would obtain an advantage over his client.

■   For these reasons, we agree with the trial court's conclusion that the alleged agreement was the result of undue influence and hence was a violation of Janger's fiduciary duties within the meaning of Probate Code section 16004. Nevertheless, the agreement is voidable, not void. "[I]f a contract is entered into between a trustee and his beneficiary through which the former gains an inequitable advantage, either by reason of inadequacy of consideration or otherwise, the latter is entitled to rescind the contract, subject to the limitations imposed by the law governing the application of this remedy. Such contract, however, is not void, but is voidable at the election of the beneficiary." (*Estate of Berry* (1925) 195 Cal. 354, 362 [233 P. 330].) Even where a trustee is absolutely prohibited from entering into a transaction with a beneficiary, those prohibitions "do not affect the power to execute the contract, where otherwise it exists, but only the contract itself after it is executed; that is to say, they do not make the contract void, but voidable only at the option of the beneficiary, who may either affirm or repudiate it" (*Phillips v. Sanger Lumber Co.* (1900) 130 Cal. 431, 433 [62 P. 749]; see Rest.2d Contr., § 177, subd. (2) ["If a party's manifestation of assent is induced by undue influence by the other party, the contract is voidable by the victim."].)

Janger argues that even if the alleged agreement is voidable, Brittan forfeited his right to void it when he ratified it by his conduct. (See Civ.

Code, § 1588 ["A contract which is voidable solely for want of due consent, may be ratified by a subsequent consent."].) Janger's ratification argument is premised primarily on Brittan's execution on November 9 of the tenancy in common agreement with the railroad on behalf of BGJ and his tender of his portion of the capital contribution for BGJ's acquisition of the railroad property. He also relies on evidence that Brittan "watched while Goldman executed the Purchase Agreement on behalf of BGJ" and that Brittan "knew that in reliance upon his consent to the Agreement BGJ was undertaking extensive due diligence."

Janger asserts these acts constituted performance of Brittan's initial obligations under the alleged agreement and his unequivocal acceptance of the benefits of the agreement. The trial court found otherwise: "10. On the morning of Monday, November 9, Brittan delivered to Janger a draft letter conditionally tendering an initial capital contribution for BGJ and stating Brittan's objections to the Proposed BGJ Operating Agreement. (Exh. 1A) *Brittan's purpose in tendering the contribution was to preserve the purchase opportunity with the Railroad. He did not intend his contribution to evidence agreement with the terms of the Proposed BGJ Operating Agreement, about which he and Turner, his new lawyer, had strong reservations.* [¶] 11. Later in the day on November 9, Goldman, Janger and Brittan, accompanied by Turner, met at Janger's office to discuss the Railroad transaction and the Proposed BGJ Operating Agreement. . . . At the November 9 meeting, Goldman signed a Purchase and Sale Agreement with the Railroad on behalf of BGJ and Brittan signed a Tenancy-in-Common Agreement with M2B2 on behalf of BGJ (Exhs. 8, 9). Brittan did not sign the Proposed BGJ Operating Agreement because he and his lawyer, Turner, believed it was unfair to him. *Brittan's signature on the Tenancy-in-Common agreement on behalf of BGJ did not constitute or signify Brittan's agreement to the terms of the Proposed BGJ Operating Agreement or to any agreement with Janger and Goldman regarding the operations or management of BGJ. Brittan signed the Tenancy-in-Common Agreement in order to preserve the potential Railroad deal and because he was hopeful that the unresolved issues regarding the operations of BGJ between Goldman and Janger on the one hand and himself on the other could be worked out and an agreement reached.*" (Italics added.) These factual findings are completely inconsistent with the grounds asserted for ratification.

■ A trial court's findings are binding on appeal where the appellant does not expressly challenge them. (*Young v. Rosenthal* (1989) 212 Cal.App.3d 96, 114, fn. 15 [260 Cal.Rptr. 369].) That is the case here. Plaintiffs do not argue that the findings are unsupported, but that the factual issue should be resolved by a jury. Without deciding whether there is generally a right to jury trial on ratification, we conclude the factual questions underlying the issue in this case were properly before the court for decision. In considering whether

Janger violated rule 3-300, the court necessarily had to determine whether Brittan consented to the terms of the alleged agreement. (Rule 3-300(C).) And plaintiffs themselves suggested in their trial brief that the court would need to decide the issue of ratification: "If the Court determines that the November 9, 1998 oral agreement was not fair and reasonable to Mr. Brittan such that Mr. Brittan had a right to void it, the Court must then proceed to the issue of ratification." The court's findings that Brittan's actions did not constitute or signify his consent to any agreement with Janger and Goldman are fatal to plaintiffs' assertion that Brittan ratified the agreement. There is nothing left for a jury to decide with respect to this question. (See *Veale v. Piercy* (1962) 206 Cal.App.2d 557, 562–563 [24 Cal.Rptr. 91].)

The trial court properly concluded that the alleged oral agreement is unenforceable.

## II

Goldman argues that even if the agreement cannot be enforced by Janger, he should be permitted to pursue his tort claims against Brittan because he is innocent of any wrongdoing. The problem is that any rights Goldman seeks to assert arise from the alleged November 9 joint venture, which was the product of undue influence and therefore voidable by Brittan. The agreement was premised on the participation of all three men, and required Brittan to dismiss his easement lawsuit without adequate safeguards as to his decision making in the venture.

Unlike the situation in *Norwood v. Judd* (1949) 93 Cal.App.2d 276, 283 [209 P.2d 24], the alleged agreement in this case is not unenforceable merely because of the absence of a required license. And unlike the judgment creditor in *Lewin v. Anselmo, supra,* 56 Cal.App.4th at p. 701, Goldman had notice that he and Janger were seeking to engage in a transaction with Janger's client, and notice of the fairness (or unfairness) of the terms of that agreement. The unfairness in the alleged agreement favored Goldman as well as Janger, and for that reason, Goldman's rights against Brittan are not severable from Janger's.

Having concluded that Brittan was entitled to, and did void the alleged agreement, the trial court properly concluded such agreement did not confer upon BGJ or its alleged partners any right to enforcement or recovery of damages.

## III

The claims against M2B2 are essentially for interference with contractual relations and inducement to breach the November 9 oral agreement.

■ In light of the conclusion that Brittan did not ratify, and in fact voided the alleged agreement, there is no agreement on which these claims can be premised. (See *A-Mark Coin Co. v. General Mills, Inc.* (1983) 148 Cal.App.3d 312, 320–321 [195 Cal.Rptr. 859].)

This conclusion also precludes any claim against Wilson or Wilco, and the court's order granting a new trial as to these parties must be reversed and judgment entered in their favor.

## DISPOSITION

The judgment is affirmed in case B147634, and respondents in that appeal are to have their costs on appeal. The order granting a new trial is reversed in case B143157 and the court is directed to enter judgment in favor of appellants Jeff Wilson and Wilco, LLC. Wilson and Wilco, LLC, are to have their costs on appeal.

Hastings, J., and Curry, J., concurred.

The petitions of appellant Robert Goldman and respondent Jerome Janger for review by the Supreme Court were denied February 18, 2004. George C. J., did not participate therein.