Filed 10/10/24  Steiner v. Beal CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| CHARLES STEINER, an Incompetent Person, etc., | |
| Plaintiff and Appellant, | G062959 |
| v. | (Super. Ct. No. 30-2020-01146200) |
| BRUCE L. BEAL et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Deborah C. Servino, Judge. Reversed.

Chambers & Noronha and Garret R. Chambers for Plaintiff and Appellant.

Klinedinst, Heather L. Rosing, Earll M. Pott, Robert M. Shaughnessy and Tara R. Burd for Defendants and Respondents.

Plaintiff Charles Steiner, by and through his guardian ad litem Marjorie Sasson, (Steiner) appeals from the judgment entered after the trial court granted the motion for summary judgment filed by his former attorneys, defendants Bruce L. Beal and Beal Business Law.[1] Steiner sued the Beal defendants for legal malpractice, breach of fiduciary duty, and fraud. Steiner's claims arose from the Beal defendants' joint representation of Steiner and his business partner, Najdat Nissan, in the preparation of both a reorganization agreement, which divested Steiner of his ownership interest in Nissan and Steiner's professional corporation, and a veterinary services agreement, which converted Steiner's status in that corporation from employee to independent contractor.

We reverse. For the reasons we explain, a triable issue of material fact exists as to whether the Beal defendants breached their professional duty to Steiner because, inter alia, they failed to secure Steiner's *informed* consent before they proceeded to jointly represent Steiner and Nissan in the preparation of the agreements. The trial court therefore erred by granting summary judgment as to the legal malpractice claim on that basis. The Beal defendants further failed to show Steiner could not establish the causation element of that claim or that the claim was time-barred.

Because the Beal defendants did not move, in the alternative, for summary adjudication, we do not address whether summary judgment was properly granted as to Steiner's claims for breach of fiduciary duty and fraud.

---

[1] We refer to Bruce L. Beal as "Beal" and to both defendants collectively as "the Beal defendants."

UNDISPUTED AND ADDITIONAL FACTS

I.

SEPTEMBER 2011: BEAL PREPARES A SHAREHOLDER OWNERSHIP AGREEMENT

In September 2011, the Beal defendants represented Avocado Animal Hospital, Inc. (the corporation), and veterinarians Steiner and Nissan as the directors of the corporation, in the corporation's acquisition of a veterinary hospital for the purchase price of $1 million. Beal worked to incorporate and organize the corporation itself and, in so doing, prepared a "Buy-Sell Agreement Among the Shareholders of Avocado Ani[]mal Hospital, Inc., and Avocado Ani[]mal Hospital, Inc." (some capitalization omitted) (buy-sell agreement), which established Nissan and Steiner each owned 50 percent of the corporation's shares.

The 12-page buy-sell agreement provided at paragraph 7 that in the event a shareholder was no longer employed by the corporation due to the shareholder's retirement, resignation, change to part-time employment, or termination by the corporation for cause,[2] "the remaining Shareholder shall purchase all or any part of the shares owned by the Shareholder at the price and on the terms provided in this Agreement." The buy-sell agreement provided in paragraphs 9, 12, and 13, that upon the occurrence of a

---

[2] The buy-sell agreement provided the term "'cause'" "means any of the following": (1) a felony conviction; (2) a misdemeanor conviction which results in the imposition of a term of incarceration for more than 30 days, and/or directly affects the corporation, and/or involves dishonesty; (3) "gross misconduct, gross carelessness, dishonesty, and/or gross neglect of duties which has a substantial, direct, and material adverse effect on the Corporation's business"; (4) the commission of any act of discrimination, sexual harassment, or other action which results in the assessment of a civil penalty and/or civil damages against the corporation; or (5) the suspension or revocation of the shareholder's professional license to practice veterinary medicine in California.

"Triggering Event," including the "termination by the Corporation for cause," the departing shareholder would be paid the fair market value of his shares in the corporation.[3] The buy-sell agreement also provided it could be amended by the parties' written consent.

## II.

### SEPTEMBER 2016: NISSAN CONTACTS BEAL FOR ADVICE IN INCREASING HIS OWNERSHIP INTEREST IN THE CORPORATION; BEAL AND NISSAN COMMUNICATE REGARDING RESTRUCTURING THE CORPORATION

About five years later, on September 13, 2016, Beal received an e-mail from Nissan stating: "Hi Bruce, . . . . [¶] I was not sure if you remember but you help[ed] us [in] obtaining [A]vocado [A]nimal [H]ospital . . . . [¶] I am thinking of increasing my share in the practice. I worked and [*sic*] working way harder than my partner and I have been producing 80% of the income to the practice by myself. I don't think it is fair to me to keep 50% shares any more. [¶] Let me know if you have ideas and or other suggestion to what we should do. [¶] . . . [¶] Dr. Nissan."

That same day, Beal responded to Nissan in an e-mail stating: "Dear Dr. Nissan, [¶] Yes, I remember you well. [¶] I must remind you that I represent the corporation and not either of the owners individually. [¶] Having said that, there are general ways to approach this problem through careful design of compensation programs, i.e. salary and bonus compensation, as well as dividends. This should be done through your tax accountant . . . , so

---

[3] The buy-sell agreement further provided, at paragraph 8, that in the event of a shareholder's disability, in addition to paying that shareholder the fair market value for his shares, "[t]he Corporation shall continue to pay the salary of a disabled Shareholder who is an employee of the Corporation for a period not to exceed 12 months at full monthly salary reduced by the amount of any federal or state disability compensation and/or disability insurance benefits received by the Shareholder."

that the IRS does not restate these matters. [¶] The one item that comes to mind to address your concern is tying compensation to percentage of revenues, so that those who bring in the most revenue obtain the most compensation. That way, only the income above expenses, including compensation, gets split 50/50. [¶] I hope this helps. [¶] Sincerely, [¶] Bruce." The parties agree in their respective separate statements that Beal, as prior counsel for the corporation, could not represent either Steiner or Nissan in a manner that was adverse to the other.

Ten months later, on July 13, 2017, Nissan sent Steiner a letter providing notice Nissan was terminating the buy-sell agreement on the ground Steiner had breached that agreement. Nissan's letter stated in part: "This letter serves as official notice that I Dr. Najdat, Nissan DVM am official[ly] putting you on notice that you have breached our buy-sell agreement dated 9-20-2011 and I am terminating said agreement. The violation occurred as defined in section 7(a)(3) of the Buy-Sell Agreement. [¶] Definition of the clause/violation: [¶] *Gross misconduct, gross carelessness, dishonesty, and/or gross neglect of duties which has a substantial, direct, and material adverse effect on the Corporation's business.* [¶] At this time we ask that: Marjorie Sasson,[4] cease and desist from communicating and making any additional contact or representations on behalf of or with any employee, vendor, government agency or company that is associated with the Avocado Animal Hospital." (Boldface omitted.) The parties do not cite evidence in the record, and we have found none, that explains how Steiner engaged in gross

---

[4] The record identifies Sasson as Steiner's girlfriend at this point in time; they have since married.

misconduct, gross carelessness, dishonesty, and/or gross neglect of duties as asserted in the letter.

The following day, Beal received the following e-mail from Nissan: "Good morning Bruce, . . . . This [is] Dr Nissan from Avocado Animal Hospital . . . . [¶] Dr. Steiner is releasing his share to me. We both come [sic] to agreement that I am taking 100% responsibility and shares of the hospital. I am not sure what type of legal documents we should sign and change. [¶] Kindly if you have any suggestions or plans. [¶] Thanks a lot [¶] Dr Nissan."

That same day, Beal responded to Nissan via e-mail: "Dr. Nissan, [¶] I am still in the saddle. [¶] What are the terms? Is Dr. Steiner [w]alking away? [¶] I need to review the original transaction and will get to this as soon as possible, probably Monday, OK? [¶] Sincerely, [¶] Bruce." Nissan replied: "Yes he is done and does not want to have part in it. I guess it is very complicated. He just want[s] to stay and work in the place as an [sic] [¶] Please if you could figure it out and let me know. [¶] . . . [¶] Dr Nissan."

Three days later, on July 17, 2017, Nissan sent an e-mail to Beal, stating: "Hi Bruce, . . . . [¶] Was not sure if you were able to review the documents. [¶] Dr. Steiner's girlfriend admit[ted] to our office manager that she interfered with 2015 business tax and because of that we are getting audit by IRS. She does have a copy of my K1 form. I am not sure how she obtained it? [¶] I gave Dr. Steiner a notice and asked him to stop her from interfering in the business aspect. I had you state that in the contract if you remember. [¶] He is walking out of the shares and ownership of the hospital like I told you. [¶] I am not sure what should be done legally. [¶] Please let me know if you have a plan to discuss? [¶] Here is attached copy for your info. [¶] . . . [¶] Dr. Nissan." Nissan e-mailed to Beal a copy the letter he sent to Steiner providing Steiner notice of the termination of the buy-sell agreement.

6

JULY 2017: NISSAN AND STEINER SIGN AN AGREEMENT CONSENTING TO BEAL'S JOINT REPRESENTATION OF THEM IN RESTRUCTURING THE CORPORATION

As of July 18, 2017, Beal was aware of several conflicts and/or disputes between Nissan and Steiner, including Nissan's discontent with the compensation arrangement, their relative work production, an alleged audit, Sasson's alleged interference with the corporation by, inter alia, having a copy of Nissan's K-1 form, and Nissan's notice of termination of the buy-sell agreement on the ground of Steiner's alleged gross misconduct.

The morning of July 18, 2017, Beal sent an e-mail to Nissan, stating: "Dr. Nissan, [¶] You describe an apparent dispute between you and Dr. Steiner. [¶] Before we get any further with this, I hope you remember, that according to the attorney-client agreement among us, I legally represent only Avocado Animal Hospital, Inc., and charge only this corporation for my fees. [¶] I only represent the interests of the Corporation. So, I do not individually represent any of the founders, shareholders, directors, officers, employees, or agents of the entity, including you and Dr. Steiner, other than in your and their corporate capacity. [¶] I also represented in that agreement that I am not a specialist in tax or accounting matters, and my engagement does not include any professional services with respect to tax and accounting matters. I believe you have retained an accountant or other tax specialist for advice with respect to any tax or accounting matters related to corporation. [¶] I also represented that my services will not include litigation of any kind, whether in court or administrative hearings or before government agencies or arbitration tribunals, although I will, if you desire, refer you to an attorney with suitable litigation experience in the geographical area of the litigation. [¶] *I do note that a separation from the corporation is subject to a Buy-Sell*

*Agreement, which applies, unless a superseding, voluntary agreement (resolution) is successfully entered into between you and Dr. Steiner with different terms that [sic] the Buy-Sell Agreement. [¶] Has there been any discussion about the Buy-Sell Agreement or any other voluntary agreement for this dispute?* [¶] I assume that the Note has been paid to the Seller. Please confirm.[5] [¶] If there is unlikely to be a satisfactory resolution of this matter between you two shareholders, and the differences are significant, then you will both need to engage your own legal counsel for the reasons stated above, in which case mediation should be employed first, *according to the Buy-Sell Agreement*. [¶] Please Advise. Thank you. [¶] Sincerely, [¶] Bruce." (Italics added.)

A few minutes later (according to e-mail time stamps) Beal again e-mailed Nissan, asking: "Is he asking for any dollars for his corporate stock, or is he willing to sign it over for nothing? [¶] Are you willing to have him work for the corporation as an employee or independent contractor, if he can fit that description?" Beal asked Nissan to confirm whether Steiner was asking for any compensation for his corporate stock because he "couldn't believe that [Steiner] would do that." Beal stated: "I just found it hard to believe somebody would walk away from the stock of a corporation that might have value."

That same day, Beal, Nissan, and Steiner participated in a telephone call lasting no more than 10 to 15 minutes (the July 18 telephone

_____

[5] Beal admitted he never thereafter inquired or learned whether or not the "Note" to the seller of the practice the corporation acquired was paid off. He did not know whether the "Note," or any part of it, remained a corporate liability because he never reviewed any of the corporation's financial statements or balance sheets.

call). This is the first time our record shows Beal had *any* communication with Steiner since Nissan had first reached out to Beal in September 2016 regarding his desire to reorganize the corporation's ownership structure.

According to Beal's declaration filed in support of the motion for summary judgment, "Nissan and Steiner informed [Beal] that they had reached an agreement concerning the restructuring of [the corporation], and [they] discussed the potential mechanisms to achieving their requested result. [Beal] advised them both concerning the potential conflicts, that [Beal] would require written informed consent in order to proceed with the restructuring, and that [Beal] could not advise either party relative to their individual interests. [Beal] further advised them to seek independent counsel to represent their personal interest. When the call was completed, it was [Beal's] understanding that Steiner and Nissan had resolved any potential conflicts prior to contacting [Beal] and were aligned in their decision for Nissan to acquire 100% ownership and responsibility in [the corporation], and that Nissan [sic] would continue to provide services at [the corporation] as an independent contractor."

At no time during the July 18 telephone call, did they discuss the audit, Nissan's complaints about Sasson, or Nissan's notice of termination of the buy-sell agreement on the ground of Steiner's gross misconduct. They also did not discuss the fact Beal did not have information about the company's finances or about Beal's perception of the existence of "an unusual situation where a doctor would just walk away." Beal explained: "Well, I would expect [Steiner] to review the documents and talk to me about problems, if he had a problem with it."

Beal did not remember Steiner asking any questions during the telephone call, generally or specifically. Beal stated Steiner "was a quiet guy"

9

and was quiet on the July 18 telephone call. In his deposition in a different lawsuit, Beal was asked: "[W]hen [Steiner] didn't raise any questions, didn't make any inquiries, made no suggestions, you didn't follow up and say, Are you sure you understand this? You didn't do that, did you?" Beal responded, "No. Why would I?"

Beal sent an e-mail to Nissan and Steiner (the first also sent to Steiner) to which was attached a "Consent to Joint Representation Letter" regarding his representation of both parties in facilitating a reorganization of the corporation. The Consent to Joint Representation Letter was a form/standard letter which did not specifically identify any of the potential or actual disputes and conflicts between Nissan and Steiner.[6] The letter stated:

---

[6] The letter included the following general provisions:

"Duty of Confidentiality and Loyalty; Conflicts of Interest

"As your attorney, I owe you a duty to preserve any confidential information you share with me, unless you authorize me to disclose such information. Similarly, I owe you a duty to act solely in your best interests, without being influenced by the conflicting interests of other clients. If I represent two individuals, I have a potential conflict of interest resulting from my conflicting duties to your separate individual interests. For example, in advising you regarding your business restructuring, I would ordinarily be obliged to make known to you any information that I believe might be important to you in making your decisions in this regard. I could not advise you that actions planned by the other might be adverse to your own personal interests, unless the other consents.

"Each of you may have differing and conflicting interests and business objectives. You may have different views on how assets and liabilities should be distributed between you. In some situations, it may be advisable to distribute assets and liabilities to take advantage of available tax benefits or avoid tax liabilities. In this regard, I recommend that you seek independent tax advice. These are just a few general examples. Each situation is unique."

10

"As a preliminary matter, I am advised that there is currently no dispute between you both in this regard." Beal stated he "used" the Consent to Joint Representation Letter as a "test" for Steiner to determine if Nissan and Steiner were actually in agreement and had no conflicts. Beal testified, "Well, if he didn't sign the letter, that would be very good impetus that he didn't agree with it."

When asked in a deposition taken in a different lawsuit, "on what basis did you tell Dr. Steiner [in the Consent to Joint Representation Letter] that you were advised that there was no dispute between [Steiner] and Dr. Nissan?" Beal responded: "On the basis that *Dr. Nissan* was advising me that [Steiner] had agreed to not be a shareholder, didn't want the risks and responsibilities of being officer and director, but wanted to work at the clinic. And I needed to test that. And this is the test right here, you know" (italics added), referring to the Consent to Joint Representation Letter. When asked, "Did you take any steps, other than sending out this letter, to test Dr. Steiner's awareness of conflicts or actual agreement to the terms of the proposed reorganization?" He responded "No" and "This [letter] is the test."

During that same deposition, Beal was asked: "Didn't you think that [Steiner] would want to know the contents of the emails you'd had with Dr. Nissan over the past year?" Beal testified: "He would probably want to . . . know a lot. If he wanted to know what he should have known, he would have called me or he would have emailed me or he would have said, 'I'm not'-- or he wouldn't have signed it."

Steiner stated he read the Consent to Joint Representation Letter but "did not know exactly . . . what was going on with it." He could not remember if he asked Beal to explain it to him after the brief July 18 telephone call. Steiner knew Nissan wanted to restructure the corporation,

but Steiner did not know what he meant; he did not ask Nissan questions. He did not know what the result of a restructure would be. Steiner understood Nissan to always be happy with his performance and never had a conversation with him suggesting otherwise.

Beal received back from Nissan copies of the Consent to Joint Representation Letter, signed via electronic signature by Nissan and Steiner dated July 19, 2017; Nissan did not copy Steiner on the transmittal e-mail. Beal did not receive a signed copy directly from Steiner. Beal thereafter considered himself engaged. He did not forward any signed copy of the letter to Steiner because he assumed he already had it.[7] When asked "And you made no inquiry to reach out to make sure he had gotten it, read it or understood it?" Beal responded, "Well, I assumed. He had signed it." Beal did not have information whether Steiner had any prior experience with corporate reorganizations.

## IV.

### JULY 2017: BEAL PREPARES AGREEMENTS DIVESTING STEINER OF HIS OWNERSHIP INTEREST AND STATUS IN THE CORPORATION

With the Consent to Joint Representation Letter in place, Beal proceeded to prepare documents to memorialize a restructuring of Nissan's and Steiner's respective ownership interests in and the reorganization of the corporation. On July 21, 2017, Beal prepared a reorganization agreement and a veterinary services agreement (the agreements), providing, pursuant to Nissan's instructions, Steiner's 50 percent ownership of the corporation be transferred to Nissan, and Steiner's status with the corporation be changed

---

[7] Beal stated, "I copied [Steiner] on the agreement and I hadn't heard from him separately."

from employee to independent contractor. In so doing, Beal did not inquire about the corporation's financial status (Dr. Nissan's evaluation of the fair market value of the corporation in July 2017 was $1 million), or the status of the corporation's outstanding loans (which amounted to $814,643.09).[8] Beal stated he did not advise Steiner on the corporation's finances because he did not want to "un[do] the deal." Beal admitted he would have inquired about the corporation's financial status if Steiner had been his sole client. He further admitted he could not be as thorough with either Nissan or Steiner because he represented them jointly.

After reading the reorganization agreement, Steiner was not sure what the agreement's purpose was. Before he signed the reorganization agreement, he had no idea what the document would accomplish.

Steiner did not receive any compensation in exchange for the restructuring of the corporation and the transfer of all his shares to Nissan. When Beal was asked what he understood Steiner got out of the deal, and to identify the consideration that supported the reorganization agreement, Beal stated: "I understood it that he was--and I don't know if it had any relationship to tax problems or whatever, but he just did not want to be responsible have the risk of being a shareholder, director or officer of the corporation." When asked what risks he thought existed at the time, Beal responded "Well, the I.R.S. comes to mind," but he also acknowledged he did

---

[8] It is unclear the extent to which this amount reflects debt for which Steiner was personally liable. As of July 31, 2017, the corporation had approximately $1,780,359.86 in the bank. It is Steiner's position the value of his one-half ownership interest in the corporation at that time was, "at a minimum," of $982,858.35.

not know whether the corporation was an S corporation or C corporation and did not inquire.

While Nissan had mentioned something about an audit to Beal, Beal did not ask about it, explaining he "had no reason to not believe [his] clients at this point." Beal did not know whether (1) there was any lawsuit then pending against the corporation; (2) the corporation had any money in the bank; or (3) the extent to which Nissan and/or Steiner had any personal liability on the corporation's debts including any outstanding amount owed on loans taken out for the 2011 purchase of the veterinarian practice. Other than being absolved of unidentified responsibilities and liabilities attendant to being a shareholder of the corporation, the only thing Beal could identify as benefiting Steiner in the deal was to have more freedom "to come in when he wanted to come in."

The veterinary services agreement provided Steiner would be retained by the corporation as an independent contractor, but failed to specify the amount of compensation Steiner would be entitled to receive for his services. Beal acknowledged the amount of such compensation would be a material term that should have been included in the veterinary services agreement but was not. In addition, the veterinary services agreement provided it could be terminated by the corporation or Steiner "for any reason or no reason." Beal did not have any conversations or communications with Steiner about the terms of the veterinary services agreement; Beal testified

Steiner "was very quiet."[9] In signing both of the agreements, Steiner did not know what he was "getting in exchange for signing" them.

On July 23, 2017, Beal e-mailed the two agreements, in PDF form, to both Nissan and Steiner. That same day, Nissan e-mailed Beal stating he would have his bookkeeper send a copy of each agreement. Our record contains copies of the agreements signed by Nissan and Steiner. Both of the agreements had an effective date of August 1, 2017.

V.

SEPTEMBER 2017: NISSAN FIRES STEINER

On September 15, 2017, Nissan sent Steiner a letter notifying him of the termination of the veterinary services agreement, effectively firing Steiner. The letter asserted Steiner's "material breach" of that agreement by engaging in "conduct detrimental to the wellbeing of the [corporation], its facilities, employees and customers." (Italics and boldface omitted.)

VI.

MAY 2018: STEINER IS DIAGNOSED WITH AN ALZHEIMER'S-RELATED DISEASE

In May 2018, Steiner was diagnosed with posterior cortical atrophy, a disease related to Alzheimer's disease. Steiner was found at that time to have suffered significant cognitive impairment. The severity of the disease as of May 2018 indicated Steiner had been suffering cognitive impairment during the prior two to four years. As of May 23, 2018, Steiner lacked capacity to make financial, legal, or medical decisions.

---

[9] Beal could not recall Steiner ever relaying any verbal communication with Beal other than a "hello" during the short July 18 telephone call. Steiner never sent Beal an e-mail throughout the entirety of Beal's involvement with the reorganization transaction. In contrast, our record includes e-mails Steiner sent to Beal in 2011 regarding the formation of the corporation and acquisition of the veterinary practice.

PROCEDURAL HISTORY

In February 2020,[10] Steiner, by and through his guardian ad litem Sasson, initiated this action. In 2021, Steiner filed the second amended complaint (the complaint) against the Beal defendants for legal malpractice, breach of fiduciary duty, and fraud.[11]

In December 2022, the Beal defendants filed a motion for summary judgment (the motion), arguing the legal malpractice and breach of fiduciary duty claims were barred by the one-year statute of limitations set forth in Code of Civil Procedure section 340.6, and all causes of actions failed for lack of a triable issue of material fact.

The trial court granted the motion, concluding there is no triable issue of material facts as to any of Steiner's claims against the Beal defendants. In its minute order granting the motion, the court ruled on the parties' evidentiary objections, granted the Beal defendants' request for judicial notice, and granted in part and denied in part Steiner's request for judicial notice; Steiner has not challenged any of those rulings in this appeal.

Judgment was entered in favor of the Beal defendants and against Steiner. Steiner appealed.

---

[10] The parties entered into tolling agreements providing additional time to initiate this lawsuit. In the motion for summary judgment, the Beal defendants argued, as discussed *post*, Steiner's claims for legal malpractice and breach of fiduciary duty were time-barred because the tolling agreements were not entered into soon enough.

[11] The complaint also asserted a claim for professional negligence (accountant malpractice) solely against another named defendant, Terry Flinchum. As Flinchum was not a party to the motion for summary judgment, that claim as alleged against him is not at issue in this appeal.

DISCUSSION

I.

GOVERNING LEGAL STANDARDS AND STANDARD OF REVIEW

"'Summary judgment is appropriate only "where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law."' [Citation.] A moving defendant bears the burden to show that the plaintiff cannot establish one or more essential elements of the cause of action, or that there is a complete defense to that cause of action. [Citations.] If the defendant meets this burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or defense thereto.' [Citation.] We review an order granting summary judgment de novo, 'liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.'" (*Hassaine v. Club Demonstration Services, Inc.* (2022) 77 Cal.App.5th 843, 849–850.) "[A]ny doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.)

II.

TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO THE
LEGAL MALPRACTICE CLAIM

In support of his legal malpractice claim, Steiner alleged the Beal defendants breached their duty of care owed to him by failing to (1) conduct a full and complete investigation of all facts and circumstances relevant to the representation of Steiner; (2) identify any potential and/or actual disputes, disagreements or conflicts between Steiner and Nissan; (3) identify and/or recognize a non-waivable conflict between the parties and require Steiner to obtain independent counsel; (4) fully disclose to Steiner all potential and/or

17

actual disputes, disagreements and/or conflicts; (5) communicate all facts and circumstances relevant to the factual and legal issues during the representation; and (6) render advice and exercise judgment with the professional skill, knowledge, prudence, and care as is commonly exercised by lawyers practicing in Orange County.

The complaint further alleged, as a result of the Beal defendants' breach of duty, Steiner has been subjected to three years of litigation with the corporation and Nissan, thereby suffering damages related to incurring attorney fees, costs of litigation, and other special damages. Steiner also alleges he suffered special damages in the form of lost wages, lost profits, and lost equity shares in the corporation he would not have relinquished without proper compensation.

In the motion, the Beal defendants argued the legal malpractice claim fails because the undisputed evidence showed they did not breach the duty of care they owed Steiner, Steiner could not prove causation, and, in any event, the claim was time-barred. The trial court granted the motion as to the legal malpractice claim on the ground Steiner failed to show the existence of a triable issue of material fact as to whether the Beal defendants breached their duty of care in their joint representation of Nissan and Steiner in the preparation of the agreements. For the reasons we explain, the trial court erred in granting the motion.

A.   *Triable Issues of Material Fact Exist as to Whether the Beal Defendants Breached Their Professional Duty to Steiner*

In a legal malpractice case, "the plaintiff must generally establish '(1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the

18

resulting injury; and (4) actual loss or damage resulting from the attorney's negligence.'" (*O'Shea v. Lindenberg* (2021) 64 Cal.App.5th 228, 235.)

The California Rules of Professional Conduct regulate professional conduct of California State Bar members through discipline. These rules were adopted "to protect the public, the courts, and the legal profession; protect the integrity of the legal system; and promote the administration of justice and confidence in the legal profession." (Cal. Rules Prof. Conduct, rule 1.0(a).)

Former Rule 3-310 of the California Rules of Professional Conduct (former rule 3-310), which was in effect at all relevant times at issue in this case, provided in part in section (C): "A member shall not, *without the informed written consent of each client*: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict." (Italics added.) Section (A)(2) of former rule 3-310 defines "'Informed written consent'" as "the client's or former client's written agreement to the representation following written disclosure." Section (A)(1) of that rule, in turn, defines the term "'Disclosure'" as "informing the client or former client of *the relevant circumstances* and of t*he actual and reasonably foreseeable adverse consequences to the client* or former client." (Italics added.)

While a violation of the Rules of Professional Conduct "subjects an attorney to disciplinary proceedings, [it] does not in itself provide a basis for civil liability." (*BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1227; see Cal. Rules Prof. Conduct, rule 1.0(b)(3) ["A violation of a rule does not itself give rise to a cause of action for damages caused by failure to comply with the rule. Nothing in these rules or the Comments to the rules is

19

intended to enlarge or to restrict the law regarding the liability of lawyers to others"].) Those rules, however, "'together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which the attorney owes to his or her client.'" (*BGJ Associates v. Wilson, supra*, 113 Cal.App.4th at p. 1227.) Consequently, a violation of the Rules of Professional Conduct "prohibiting concurrent representation of conflicting interests without each client's informed written consent *constitutes evidence of malpractice liability* and breach of fiduciary duty" even though such a violation does not, standing alone, prove the malpractice. (*Yanez v. Plummer* (2013) 221 Cal.App.4th 180, 188, italics added.)

In the motion, the Beal defendants argued the undisputed evidence showed they did not breach the duty of care they owed Steiner because the undisputed evidence showed Beal obtained Steiner's informed written consent before jointly representing Nissan and Steiner in 2017. In support of their argument, they cite evidence of the July 18 telephone call, the disclosures of potential conflicts Beal made in the Consent to Joint Representation Letter, and the fact Steiner signed that letter.

It is undisputed the July 18 telephone call between Beal, Nissan, and Steiner took place. But it is also undisputed that conversation, which lasted only about 10–15 minutes, was the first time Beal had any contact in any form with Steiner since Nissan reached out to Beal in 2016 to discuss changing the corporation's ownership structure he felt was no longer fair to him. Until that point in time, the evidence shows Nissan was the only one who sought to change the corporation's ownership structure and seemed set on doing so as quickly as possible after he sent Steiner the letter of termination of the buy-sell agreement on July 13, 2017.

20

It was Nissan alone who reported to Beal before the July 18 telephone conversation that Steiner had agreed to surrender to Nissan the entirety of his ownership interest in the corporation without any compensation in return even though the buy-sell agreement provided for compensation in the event of the termination of that agreement. It is undisputed that as of the July 18 telephone conversation, Beal was aware there were problems between Nissan and Steiner, which included Nissan's discontent with the corporation's ownership structure, their relative work production, an alleged audit, Sasson's alleged interference with the corporation, and Nissan's termination of the buy-sell agreement on the ground of Steiner's gross misconduct. Nevertheless, by the end of the July 18 telephone conversation, Beal concluded they had "resolved any potential conflicts."

Beal made this determination even though: (1) The issues of the audit, Sasson's alleged interference in the corporation, and the termination of the buy-sell agreement for Steiner's alleged gross misconduct were not discussed during the July 18 telephone conversation; (2) Steiner did not speak to or otherwise communicate with Beal other than to say hello; (3) Steiner did not ask Beal any questions; (4) Beal considered it unusual for someone in Steiner's position to walk away from his ownership interest—in fact he could not believe it; (5) Beal did not inquire about the corporation's finances or ask any questions of Steiner that might have elicited information explaining why Steiner might have agreed to make such a decision; and (6) Beal did not raise the issue of the corporation's finances with Steiner (because he did not want to undo the deal Nissan told him already had been agreed to by Steiner). Triable issues of material fact exist as to whether Beal

21

*reasonably* concluded the interest of Nissan and Steiner did not actually conflict.

In addition, the record contains evidence showing the corporation was solvent. There was no evidence of any pending lawsuit against it and the record is unclear about the extent to which Steiner was personally liable for any of the corporation's then-current debt.

Furthermore, notwithstanding Steiner's lack of communication, evidence shows Beal assumed, when it came to Steiner, no news was good news, and thereafter opted to confirm or, in Beal's words, "test," Steiner's acquiescence with the plan communicated by Nissan by simply declaring in the Consent to Joint Representation Letter that he understood there was no dispute between them. After he received from Nissan, and only from Nissan, a copy of that letter signed (electronically) by Nissan and Steiner, the evidence shows Beal considered himself in the clear to jointly represent Nissan and Steiner and proceeded to prepare the agreements with the terms provided by Nissan.

Although the Consent to Joint Representation Letter contained general disclosures, a triable issue of material fact exists whether it or any other communication by Beal sufficiently informed Steiner of the relevant circumstances and the actual and reasonably foreseeable adverse consequences he faced by agreeing to the proposed joint representation arrangement within the meaning of former rule 3-310. We reject any suggestion evidence a client signed a consent to joint representation agreement in and of itself precludes a finding an attorney breached the duty of care to the client as a matter of law.

The Beal defendants offered no expert opinion supporting their position they discharged their duty with respect to the issue of informed

22

consent. The trial court erred by concluding no triable issues of material fact exist as to whether Beal breached his duty to use the skill, prudence, and diligence commonly possessed and exercised by members of his profession. (See *O'Shea v. Lindenberg, supra*, 64 Cal.App.5th at p. 235.)

## B. Triable Issues of Material Fact Exist as to Whether the Beal Defendants' Alleged Breach of Duty Caused Steiner Damages and Whether the Claim Was Time-barred

In the motion, the Beal defendants also argued the legal malpractice claim fails because no triable issue exists as to the causation element and because it is barred by the governing one-year statute of limitations set forth in Code of Civil Procedure section 340.6. That the trial court granted the motion on an erroneous basis does not end our analysis as "our review of the judgment on the summary judgment order is not limited to the issues decided by the trial court." (*Gray v. La Salle Bank N.A.* (2023) 95 Cal.App.5th 932, 967.) To the contrary, "we must '"affirm the judgment of the trial court if it is correct on any theory of law applicable to the case"'" (*ibid.*) provided the parties have been given adequate opportunity to address that theory in the trial court (*id.* at p. 948).

We therefore turn to review whether the judgment as to the legal malpractice claim can be affirmed on either of the specified grounds.

### 1. A triable issue of material fact exists as to whether the Beale defendants' alleged breach of duty caused Steiner's alleged damages

In the motion, the Beal defendants argued, even if a triable issue of material fact existed as to whether they breached their professional duty to Steiner, his malpractice claim fails because he cannot demonstrate causation. "Causation in a professional malpractice context means establishing by a preponderance of the evidence that, but for the negligence, 'the plaintiff

23

would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred.'" (*O'Shea v. Lindenberg, supra*, 64 Cal.App.5th at p. 236.)

Here, a triable issue of material fact exists as to whether Steiner would have agreed to the joint representation arrangement and/or signed the agreements had Beal first provided Steiner with adequate disclosures. At a minimum, the evidence suggests had he been so informed, Steiner might have consulted independent counsel sooner and not agreed to relinquish his ownership interest in the corporation to Nissan without any compensation. It is not unfounded speculation that Steiner might have consulted independent counsel because our record shows he did retain independent counsel by September 2017—the month after the agreements became effective.

Beal's admission he did not want to advise Steiner on the corporation's finances because he did not want to "un[do] the deal" underscores the existence of a triable issue of material fact on this issue. We therefore cannot affirm the judgment on the ground Steiner could not establish the causation element.

2. A triable issue of material fact exists as to whether the legal malpractice claim is time-barred

In the motion, the Beal defendants argued the legal malpractice claim was not timely filed. Code of Civil Procedure section 340.6, subdivision (a) provides in part: "An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered,

24

the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first."

In the motion, the Beal defendants argued, because the last day they performed any work for Steiner was on August 6, 2017, Steiner had until August 6, 2018 to file his legal malpractice claim under Code of Civil Procedure section 340.6, but he did not do so. They acknowledged they entered into tolling agreements with Steiner to initiate this action, but they argue those agreements were ineffective because none was entered into before August 15, 2018, and thus after the statute of limitations had run on that claim.

As triable issues of material fact exist as to whether Beal provided Steiner with adequate disclosures to enable Steiner to give his informed consent to the joint representation arrangement, triable issues of material fact exist as to when Steiner learned, or reasonably should have learned, of any such omissions on Beal's part. On this record, we cannot conclude Steiner's legal malpractice claim is time-barred as a matter of law within the meaning of section 340.6 of the Code of Civil Procedure.

III.

BECAUSE THE MOTION DID NOT SEEK SUMMARY ADJUDICATION, WE DO NOT REACH THE BEAL DEFENDANTS' CHALLENGES TO STEINER'S OTHER CLAIMS

The Beal defendants did not move for summary adjudication of individual theories or claims; they only moved for summary judgment. As we conclude summary judgment should not have been granted because a triable issue of material fact exists as to the legal malpractice claim, we do not reach the Beal defendants' challenges to Steiner's claims for breach of fiduciary duty or fraud. (*Hedayati v. Interinsurance Exchange of the Automobile Club* (2021) 67 Cal.App.5th 833, 846 ["When as here, the defendant 'did not move

25

in the alternative for summary adjudication of specified issues, we will not address whether [it] may have prevailed on some issues in this case'"]; see Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2024) ¶ 10:45, p. 10-17 ["a court cannot grant summary adjudication where the *only* motion noticed for hearing is for summary judgment"].)

Further, because we conclude the motion was granted in error, we do not need to address whether the trial court abused its discretion by denying Steiner's request for a continuance of the hearing on the motion in order to take Beal's deposition in this case.

## DISPOSITION

The judgment is reversed. Appellant to recover costs on appeal.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.

26